**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | **CRIMINAL NO. 21-CR-625 (APM)** |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| **ROBERTO ADAMS,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

**GOVERNMENT'S NOTICE AND MOTION TO ADMIT EVIDENCE AS INTRINSIC
EVIDENCE OR, IN THE ALTERNATIVE,
PURSUANT TO FEDERAL RULE OF EVIDENCE 404(B)**

The United States of America hereby provides notice of its intent to introduce evidence described herein as intrinsic evidence relevant to the charges in the Second Superseding Indictment and moves *in limine* for a ruling on the admissibility of such evidence as intrinsic evidence. In the alternative, the Government also hereby provides notice of its intent to introduce evidence pursuant to Fed. R. Evid. 404(b). The Government makes this disclosure out of an abundance of caution so that the Government will have complied with the notice requirement of Rule 404(b) if the Court determines that such evidence is not intrinsic. Indeed, the evidence disclosed in this notice would still be admissible pursuant to Rule 404(b) because it would be offered to show Defendant Roberto Adams' motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident in his scheme to submit a second fraudulent Paycheck Protection Program (PPP) loan application for his  company, SuperKlean, to obtain funds that he used for personal gain. *See* Fed. R. Evid. 404(b)(2).  As set forth below, there are three principal areas of evidence that the government will seek to introduce at trial: (1) Adams' receipt of the first loan proceeds and depletion of the proceeds as reflected in his bank account balance; (2) the inconsistencies between the Economic Injury Disaster Loan  (EIDL) and tax submissions with the loan application,

particularly regarding ownership percentages; and (3) Adams' actions following the depletion of the loan funds in applying to the Seattle Police Department and in making a fake SuperKlean invoice and identifying fraudulent business expenses.

In support of its motion, the United States relies on the following points and authorities, and such other points and authorities as may be cited at a hearing on this motion.

## I.    Factual Background[1]

On June 12, 2020, Adams registered SuperKlean LLC ("SuperKlean") with the State of Maryland, as a limited Liability Company.  The registered address for the business was the same street and apartment as Adams' residence in Hyattsville, Maryland.  On June 25, 2020, Adams filed for Federal Tax ID, also known as an Employer Identification Number (EIN), for SuperKlean, obtaining EIN Number 85-XXXX504.

On July 25, 2020, Adams had a balance in his Bank of America (BOA) checking account (-4188) of approximately $222.46 and approximately $18.13 in his BOA savings account (-4191).

### 1.  SuperKlean's EIDL Loan Application

On or about July 8, 2020 – less than one month before applying for SuperKlean's first PPP loan – Adams applied for an Economic Injury Disaster Loan for SuperKlean, including a $10,000 advance. In Adams' EIDL application, he personally submitted the following information:

o  SuperKlean was formed on June 12, 2020;

o  SuperKlean's gross revenues for the previous 12 months prior to the date of disaster (January 30, 2020) was $0; and

---

[1] The recitation of facts in the instant brief largely tracks the government's submission in its first Motion regarding intrinsic evidence and evidence admissible under Rule 404(b).  ECF 57.  The instant brief, however, highlights facts salient to Counts Two and Three which are the subject of the upcoming retrial.  The government hereby incorporates by reference ECF 57 with respect to its background discussion on the EIDL and PPP Programs.

- o SuperKlean's gross costs for goods sold for the previous 12 months prior to the date of disaster (January 30, 2020) was $0.

However, Adams also claimed that:

- o SuperKlean had five (5) employees as of January 31, 2020;

- o Adams only owned 50% of SuperKlean; and

- o Each of his then 11-year-old children owned 25% of SuperKlean.

Adams certified under penalty of perjury that the information he provided was true and correct. On July 13, 2020, the SBA denied Adams' EIDL loan application. The loan application was rejected because, as set forth in a July 13, 2020 letter to Adams from the SBA, the "Economic Injury is not substantiated." The letter stated that "[y]our economic injury is less than the amount you received from the EIDL advance. As a result, we are unable to substantiate any additional eligibility at this time," and "the information you submitted does not indicate an economic injury."

There are no documents demonstrating that Adams' pre-teen children were actually 25% owners of SuperKlean, and there is no evidence that SuperKlean had any employees, much less five employees. Indeed, as discussed further below, in response to a grand jury subpoena, SuperKlean failed to identify a single employee, a single client, or any revenue earned by SuperKlean prior to September 2021 – more than 18 months *after* the PPP loan eligibility deadline of February 15, 2020. In addition, Adams' claim in the EIDL application that he owned 50% of SuperKlean is materially inconsistent from his claim, as detailed below, in tax filings that he owned 90% of SuperKlean. Critically, it is also inconsistent with his second loan application in which he claimed that SuperKlean had one employee, was established in 2019, and that he had 100% equity in the business. The Government is aware of no evidence that Adams filed or maintained any documents showing a change in the percentage of ownership between the time he filed his first

3

loan application and when he caused the filing of a fraudulent application for a second PPP loan.

### 2. SuperKlean's First PPP Loan Application (July 2020)

Approximately three weeks after being denied an EIDL loan, on July 31, 2020, at approximately 9:07 AM, Individual 1 ("G.B.") emailed Adams (at "robertoadams326@gmail.com") with the subject "PPP Loan Information," stating:

> Thank you for inquiring on additional information regarding the current programs available from the SBA… Loan amounts are about $20k-$60K and forgivable ( The forgivable part is 100% up to you, more info HERE)... Incorporated or not, I can mostly likely get you funded…Due to the time and research required I do charge a 5% success fee once funded… During the process it is important that you forward me any and all emails you receive related to funding from the lender in a timely manner.

The email asked for, among other things, the applicant's name, social security number, date of birth, address, phone number, email, bank account information, a driver's license photo and bank statements from February 2020. The email also offered a referral fee of $500 for any applicants who are approved for a PPP loan.  The email also contained a link to a Forbes article titled "Loan Forgiveness and SBA EIDL Programs: 10 Things Small Businesses Need to Know."  The article set forth that the specific purpose of the PPP loans were to give small businesses funding for payroll. The article stated, in part

> "The intent of Congress and the Trump Administration when passing the PPP loans was twofold: First, give small business the funding necessary to survive the Coronavirus shutdown, which the federal government estimated would last two months.  That is why the loan amount was based on your average 2019 monthly payroll multiplied by 2.5% and forgiveness is largely based on two months of payroll.  Second, to keep workers employed and on payrolls instead of sending them to the unemployment line."

At that time, SuperKlean had no payroll to multiply or workers to keep employed.

That morning, at approximately 9:13 AM, Adams, while on duty as an MPD officer in the District of Columbia, sent an email to G.B. containing his date of birth, address, email, bank account information and bank routing number. Soon after, at approximately 9:49 AM, Adams emailed G.B. a copy of his BOA accounts statement for January 25, 2020 through February 21,

4

2020. Five minutes later, at approximately 9:54 AM, Adams emailed G.B. a photograph of the front and back of his driver's license.

At approximately 9:58 AM that morning, Adams received an email from BlueVine, a financial technology company that assists in the processing of PPP loans. The email contained a link to "Activate your account." One minute later, Adams forwarded the email to G.B. Records obtained from BlueVine also indicate that the IP Address 75.191.14.220, repeatedly accessed the BlueVine Account associated with Adams on July 31, 2020. Subscriber records indicate that that the IP Address 75.191.14.220 is associated with G.B.

Records from BlueVine indicate an application was submitted for a loan for SuperKlean through the SBA's PPP. The application claimed that Adams was an eligible self-employed individual with a monthly payroll of $7,338 and sought a forgivable loan of $18,345 to cover payroll expenses. The application contained a certification that represented that the business was in operation on February 15, 2020, and "had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC." The application also contained a certification that all "SBA loan proceeds" would be "used only for business-related purposes as specified in the loan application." As part of the application materials, statements from Adams' personal savings and checking accounts with BOA were provided. The application also contained a purported 2019 Form 1040 Schedule C reporting $94,250 in gross income, $6,460 in expenses, and $88,060 in profits from a business called SUPERKLEAN. The Schedule C form indicated that Adams was the proprietor, that the business provided janitorial services, and that Adams started or acquired the business in 2019. Adams' residence was listed as the business address.

On July 31, 2020, Adams received an email from BlueVine attaching his completed and

5

signed PPP loan documents.   These documents included, among other things: (1) Paycheck Protection Program Borrower Application Form; (2) Loan Note; (3) Resolution to Borrow; and (4) SBA Form 1050 Settlement Sheet.

On July 31, 2020, Adams' application was granted, and he secured the $18,345 loan from Cross River Bank, an FDIC-insured financial institution.  On July 31, 2020, at approximately 8:40 PM, Adams paid, via the Square App, $917.25 to G.B.  This amount represented 5% of the PPP loan that Adams had obtained from Cross River Bank.  Approximately one minute later, at 8:41 PM, G.B. placed a call to Adams and they spoke for 32 seconds.  Five minutes later, at 8:46 PM, Adams called G.B. and they spoke for approximately three minutes.

On August 3, 2020, Adams' balance in his personal BOA checking account (-4188) was approximately $379.34 and approximately $9.81 in his BOA savings account (-4191).  On or about August 4, 2020, $18,345, representing the PPP loans funds, were deposited into Adams' personal accounts with BOA.  According to bank records, Adams did not use the PPP funds as required. Instead, he used the PPP loan funds primarily for his personal use, including gambling, restaurants, hotels, airfare, and a luxury car payment.

In total, between August 4, 2020, the date of the deposit of the PPP loan funds, and August 30, 2020, the Adams spent at least $25,417.84 on expenses that had no relation to SuperKlean or any outside employment.[2]  In short, rather than use the taxpayer funds as required, Adams spent

---

[2] The only other significant deposits into the checking account were on August 26, 2020 in the amount of $8,224.88 and $1,949.48 (totaling $10,174.36).  These funds appear to be unrelated to any business of SuperKlean and more than half of these funds were used for a cashier's check in the amount of $5,724.55 to pay Century Summerfield, an apartment complex in Landover, Maryland.  This cashier's check along with Adams' expenditures in Las Vegas ($6,706.28) could not have been paid for by the non-PPP loan related funds in the account.  Indeed, between August 25, 2020 and August 31, 2020, Adams' transferred $5,200 from his BOA savings account, in which he previously deposited $10,000 of PPP loan funds, to his BOA checking account.

the funds frivolously for his personal gain and enjoyment. By September 23, 2020, Adams' balance in his personal BOA checking account (-4188) was approximately -$150.39 and approximately -$20.77 in his BOA savings account (-4191) – indicating that he had spent down the entirety of the PPP loan proceeds in less than two months.

Additionally, the government's evidence, financial and other documents, including those obtained from SuperKlean, showed an absence of any income from a janitorial business or regular payroll transactions, and the Government has been unable to find any other indication that Adams ra ns such a business from his residence. For example, on October 26, 2020, an *Ex Parte* Order for the Disclosure of Tax Returns and Return Information for Adams' 2019 tax records was issued by the Court. Those tax records do not reflect any evidence of income from SuperKlean or a monthly payroll of $7,338; nor do they include the purported 2019 Form 1040 Schedule C reporting $94,250 in gross income, $6,460 in expenses, and $88,060 in profits from a business called SuperKlean submitted with Adams' first PPP application. Similarly, records from the State of Maryland, Department of Labor do not show any income claimed for SuperKlean from the first quarter of 2015 through the present for Adams or his children. MPD records also do not indicate that Adams requested or received permission to procure outside with respect to a cleaning or janitorial service, as he had in the past for other outside employment.

### 3. SuperKlean's Second Fraudulent PPP Loan Application (January 2021)

On December 30, 2020, Adams texted G.B. and said "Question, are we able to do a second ppp forgivable loan with the new stimulus package." G.B. responded, "Morninggg!!! Yes you are." Adams then responded "LOL let's do it."

On December 30, 2020, Adams received an email from BlueVine stating "We will be taking applications soon… we will happily help you apply for your first PPP Loan (Initial Draw)

7

or Second Draw." The email goes on to instruct the borrower, "You'll also want to start collecting records of payroll level and revenues in 2019 and 2020 which will likely be requested for PPP Loan Eligibility. Such records can include: For Initial Draw applicants, payroll tax filings such as 941, 940/944 Schedule C, or payroll process records, as well as bank statements or bank connections, and/or other documents pending SBA Guidance; For Second Draw applicants we're still awaiting SBA guidance." The email also states "if the business applies for a Second Draw after 1/1/21. Q4 may be included in the reduction calculation." To be clear, Adams and SuperKlean did not have any such records described in this email.

On January 20, 2021, Adams' balance in his personal BOA checking account (-4188) was approximately $135.86 and approximately $13.48 in his BOA savings account (-4191).

On January 20, 2021, Adams received an email from BlueVine stating "Get Fast Funds with the SBA Paycheck Protection Program. You may be eligible to get fast relief for your business with a Paycheck Protection Program (PPP) Second Draw loan… Existing PPP customers: … To qualify for a Second Draw loan, you must show at least a 25% reduction in gross receipts. For most borrowers, this will be based on the first, second, or third quarter of 2020 compared to the same quarter in 2019."

On January 21, 2021, Adams sent G.B. a text stating "What's up shordddddd? Blue vibe just sent me a email." G.B. responded, "Lmao I got you… Shit… What was your email addy?" Adams then provided the email address Robertoadams326@gmail.com.

Records from BlueVine indicate that, on or about January 21, 2021, at 6:40 PM, Adams caused the submission of a second borrower application for a loan through the Small Business Administration's Paycheck Protection Program. Records obtained from BlueVine also indicate that an IP Address associated with G.B. accessed the Adams' BlueVine Account. Adams'

application again claimed he was an eligible self-employed individual with a monthly payroll of $7,338 and sought a forgivable loan of $18,345 to cover payroll expenses. Adams caused the certification that the business was in operation on February 15, 2020, and "had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC." He also caused the certification that all "SBA loan proceeds" would be "used only for business-related purposes as specified in the loan application."

On or about January 25, 2021, at 11:38 AM, Adams called G.B. and spoke with her for over 11 minutes.

On January 25, 2021, at 9:54 PM, Adams received an email from BlueVine which stated "The SBA has finished reviewing your application and you've been approved for your Paycheck Protection Program loan. Accept your offer and access more information, including the next steps." There is button below the text that says "Accept Offer."

On January 25, 2021, at 9:57 PM, Adams received an email from BlueVine containing his completed and signed PPP loan documents for a second draw. These documents included, among other things: (1) Paycheck Protection Program Second Draw Borrower Application Form; (2) Loan Note; and (3) Certification Note. These documents contained false and fraudulent information and certifications to include that as of February 20, 2020, SuperKlean "had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC," and specifically with respect to the first PPP loan application:

> The Applicant received a First Draw Paycheck Protection Program Loan and, before the Second Draw Paycheck Protection Program Loan is disbursed, will have used the full loan amount (including any increase) of the First Draw Paycheck Protection Program Loan *only for eligible expenses*.

> (emphasis added).

As previously discussed, Adams used the first disbursement from August 2020 for

9

ineligible expenses, to include a personal trip to Las Vegas. By January 25, 2025, the date of Adams' certifications for the second PPP loan, he had spent the funds from the first disbursement for items wholly unrelated to SuperKlean.

The Government is not aware of any records which indicate that Adams notified BlueVine, Cross River Bank (which funded the loan), G.B., or the United States Government that the documents contained false and fraudulent certifications.

On or about January 25, 2021, Adams' application was granted and he secured a second draw of the PPP loan, in the amount of $18,345, from Cross River Bank.

On January 28, 2021, Adams received an email from BlueVine stating "Thank you for accepting your offer for the Paycheck Protection Program. We've initiated an ACH deposit into the bank account you provided in your application. You should receive your funds within 10 business days." On or about January 29, 2021, $18,345, representing the second draw of the PPP loan funds, was deposited into Adams' BOA checking account. On or about February 1, 2021, Adams made a payment of $12,110.91 to Property Payment Rent using proceeds from his illicit conduct.[3]

By February 20, 2021, Adams' balance in his personal BOA checking account (-4188) was approximately $644.20 and approximately -$10.43 in his BOA savings account (-4191). In other words, approximately 23 days after he received $18,345 in PPP loan funds, the money was gone. It was not spent on SuperKlean's expenses, an entity with no clients or employees. Adams spent taxpayer funds frivolously for the Adams' personal gain and enjoyment.

---

[3] On February 1, 2021, Adams also received two deposits totaling $7,047.36 ($3,696.45 and $3,350.91), in what appears to be legitimate income. However, these funds would be insufficient to cover the approximately $21,373.20 in expenditures on February 1, 2021, only $500 of which appear to be related to a purported business expenditure of SuperKlean. To cover these remaining expenditures alone required $14,325.84 in PPP loan proceeds.

On March 31, 2021, Adams sent G.B. a text containing a link to a CNBC article, titled "How just a few days cost some small businesses thousands on their PPP forgivable loans," regarding the PPP loan program and changes in the loan formula that would have meant larger loans for small businesses. (https://www.cnbc.com/amp/2021/03/15/few-days-cost-some-small-businesses-thousands-on-ppp-forgivable-loans.html). Immediately after sending the article, Adams sent another text asking "How much more???"

### 5. Adams' PPP Loan Forgiveness

On July 28, 2021, Adams texted G.B. and asked, "I got an email from scratch about the forgiveness." This appears to be a reference to the forgiveness of his first PPP loan from July of 2020. G.B. responded, "Heyyyyy! Forward it to me and I'll check it out."

In or around August 2021, Adams requested that Cross River Bank forgive the PPP loan he received on July 31, 2020.

On August 4, 2021, Adams texted G.B. and stated, "I just got another email and I forwarded it to you." This appears to be another email about the loan forgiveness.

On August 9, 2021, Adams texted G.B. and asked "Hey shordddddd, can you log in and do my second one please?" This appears to be a reference to the forgiveness of his second PPP loan from January 2021. Again, the majority of the funds dispensed for the first PPP loan that Adams received were not used for SuperKlean.

On or about August 19, 2021, Adams' PPP loan with Cross River Bank was forgiven.

## II. Planned Evidence

The Government intends to introduce three categories of intrinsic evidence at trial: (1) the first PPP loan application and Adams' use of the funds for ineligible expenses which contradict his January 2021 certification on the second PPP loan application; (2) the EIDL and tax filings,

for Tax Years 2019 and 2020, relevant to SuperKlean and are inconsistent with the second PPP loan application; and (3) Adams actions after receiving the second PPP loan, including his failure to disclose and false statement regarding SuperKlean in connection with a background investigation by the Seattle Police Department, and his creation of a false invoice and business expenditures for SuperKlean after he was alerted to the investigation.

### A. Adams' Submission of and Disbursement of Funds from the First PPP Loan in July and August 2020

As set forth above, prior to Adams' submission of the second PPP loan in January 2021, Adams applied for, received, and then spent funds in connection with a first PPP loan in July 2020. Though Adams was acquitted of the counts related to the July 2020 application, Count Two, pertaining to the second application specifically references the use of the funds in the first loan and Adams' January 2021 certification that he "used the full loan amount (including any increase) of the First Draw Paycheck Protection Program Loan only for eligible expenses." ECF 70 at 7. Adams' first PPP loan is therefore intrinsic to Count Two of the Second Superseding Indictment in that the falsity of his certifications second application turns, in part, on how Adams used the funds from the first disbursement.

### B. Adams' Inconsistent EIDL Loan Application Tax Filings

The Government expects to elicit testimony regarding the EIDL loan application, specifically the listed ownership percentage, creation date, and number of employees. The Government expects to admit evidence and elicit testimony that Adams' tax filings for Tax Year 2019 (filed on or about February 23, 2020, approximately five months before the first PPP loan) and Tax Year 2020 (filed on or about April 1, 2021, approximately two months after Adams caused the fraudulent submission of his second PPP loan and four months before he caused the submission of a request for loan forgiveness for his first PPP loan), were inconsistent with Adams operating

12

SuperKlean or any cleaning service prior to January 31, 2020 and are inconsistent with the 2019 Schedule C submitted in connection with his first PPP loan. Critically, the second PPP loan application was largely based on the first and did not require the submission of new Schedule C. Further, as with his EIDL and PPP loan applications, Adams caused the submission of inconsistent tax filings to the federal government and State of Maryland regarding business expenses. In addition, the documents also reveal material inconsistencies such as Adams (1) claiming a higher ownership percentage than claimed in his EIDL loan in order to obtain a larger tax deduction and higher refund; (2) claiming expenses inconsistent with those identified by SuperKlean in response to the grand jury subpoena. At its core, this information demonstrates the falsity of information Adams knowingly provided in the second loan application.

With respect to his 2019 and 2020 tax filings, George Buckmon, Jr., of Buckmon's Tax Services, is expected to testify that he prepared Adams' federal and Maryland state tax returns using information Adams provided to him. In addition, Buckmon is expected to testify that Adams: (1) did not provide Buckmon with documentary support (*i.e.*, receipts) for any of the costs or economic losses reported for SuperKlean; and (2) that Adams reviewed the tax returns before filing and never flagged that any of the information contained in the filings was incorrect.

There is no reference in this tax return to any work or expenses for SuperKlean, specifically there is no Schedule C related to SuperKlean. Further, Adams' 2019 federal tax returns demonstrate his knowledge, intent, and lack of mistake in declaring that SuperKlean did not have any work or expenses.

On Adams' 2020 federal income tax return, he reported an income loss of $15,012 for his business SuperKlean, which reduced his reportable income to $67,875. In addition, Adams caused Buckmon to complete and file on Adams' behalf a Form 1065 U.S. Return of Partnership Income

for 2020.  Importantly, the form states that Adams started SuperKlean on June 25, 2020 – well after the February 15, 2020, PPP loan eligibility deadline.  It also claims a total business income loss of $16,680 – $15,012 for Adams and $834 for each of his two children – based on business expenses Adams claimed without documentary support, including automobile expenses, legal fees, supplies, and telephone expenses.  Finally, Adams caused Buckmon to complete and file three Schedule K-1's – Partner's Share of Income, Deductions, Credits, etc. – for Adams and each of his two children who were 11-years-old at the time.  The K-1's claimed that Adams owned 90% of SuperKlean, and each of his two children owned 5% of SuperKlean.  The 90% ownership is materially inconsistent with the 50% ownership Adams claimed in his EIDL loan application that the SBA denied.

On Adams' 2020 Maryland state tax return, he again reported the same income amount – $67,875.  Adams also caused Buckmon to complete and file on Adams' behalf a Maryland Form 510 Pass-Through Entity Income Tax Return for SuperKlean, in which Adams again claimed a total business income loss of $16,680, with Adams claiming 90% ownership of SuperKlean, and each of his children owning 5% of the shell company.

### C. Creation of Fake SuperKlean Invoice, False Expenditures, and Statements to the Seattle Police Department

The Government expects to admit evidence and elicit testimony that, after being arrested on a complaint by law enforcement for bank and wire fraud related to his first PPP loan in August 2021, Adams attempted to "legitimize" SuperKlean by creating a fake invoice for an individual who was never a client of SuperKlean.  The evidence demonstrates that SuperKlean was an entity without clients or business prior to August 2021, and that Adams attempted to obstruct justice by manufacturing evidence in response to a criminal investigation.  Specifically, on October 1, 2021 – nearly two months after Adams was arrested for the instant criminal activity and while the

14

Government's investigation remained ongoing – law enforcement executed a search warrant at SuperKlean's listed place of business, the same address as Adams' personal residence.  Law enforcement seized a document marked "Office Cleaning Invoice," dated September 20, 2021.  Handwritten onto the document was the company name "SuperKlean LLC," "Roberto Adams," and Adams' phone number.  Also handwritten onto the document was the "client / customer name" of "Tom Jones," with an address of "7259 Hanover Parkway" in "Greenbelt, MD."  Services rendered were described as "Bathroom x 2 . . . open area room x 7 . . . All area surface."  The invoice did not state a total cost or contain any indication that the services had been paid.  Dr. Ricardo Thomas Jones indeed exists and practices dentistry at the address notated on the invoice.  Dr. Jones is expected to testify, however, that he does not know Adams, is not aware of a business called SuperKlean, and has no records of hiring SuperKlean for cleaning services.  Tellingly, SuperKlean did not provide any documents in response to the grand jury subpoena that relate to Dr. Jones, including any communications with or prior invoices to Dr. Jones.

The Government also expects to admit evidence that in response to a subpoena requesting all of SuperKlean's expenses, Adams submitted bank statements for April 2020 – August 2021 that identified nearly $13,000 in business expenditures,[4] when in fact, further investigation confirmed that many, if not most, of the expenditures were actually for Adams' personal use.  The evidence demonstrates that SuperKlean was an entity without proper business expenses prior to

---

[4]  The Government will only seek to introduce fraudulent expenses identified from April 13, 2020 through February 6, 2021, consistent with the Government's anticipated motion *in limine* which will seek to preclude the introduction of any purported business expenses after on or about February 6, 2021, when the funds from the second PPP loan were expended.  Any purported expenses after the PPP loan proceeds were expended is irrelevant to the Adams' knowledge, intent or motive at the time he fraudulently obtained the first and second PPP loans.  It is the Government's understanding that at the Pretrial Conference of August 11, 2023, this issue was addressed consistent with the Government's stated position.

the PPP loan February 15, 2020 eligibility date or even at the time that Adams applied for the fraudulent PPP loans in July 2020 and January 2021, that Adams did not use taxpayer funds for legitimate business expenses, and that Adams attempted to obstruct justice by falsifying records in an effort to mislead a grand jury investigation. Examples of expenditures falsely identified as purported "business expenditures," which the Government seeks to admit include the following:

- o August 3, 2020, a purported "business expenditure" of $38.44 at UPrinting. *See* SuperKlean_0000398. The Government's subpoena to UPrinting for the underlying receipt revealed that the expense was for a 30 x 17 "large format poster" of MPD officers in riot gear.

- o September 11, 2020, a purported "business expenditure" of $180.20 at Foot Action. *See* SuperKlean_0000410. The Government's subpoena to Foot Action for the underlying receipt revealed that the expense was for a pair of Nike Air Max 270s, Nike Air Max 90, and two pairs of men's Ethika boxer briefs.

- o September 11, 2020, a purported "business expenditure" of $136.36 at Old Navy. *See* SuperKlean_0000410. The Government's subpoena to Old Navy for the underlying receipt revealed that the expense was for women's flip-flops, girls' jeggings, girls' sweatpants, women's socks, girls' tees, women's polo, women's jogger pants, and women's jeans.

- o October 19, 2020, a purported "business expenditure" of $12.99 at Family Dollar. *See* SuperKlean_0000422. The Government's subpoena to Family Dollar for the underlying receipt revealed that the expense was for plastic red cups, printed paper plates, and plastic forks.

- o February 6, 2021, a purported "business expenditure" of $39.49 at Dollar General. *See* SuperKlean_0000476. The Government's subpoena to Dollar General for the underlying receipt revealed that the expense was for four numeral balloons, four numeral glitter candles, cutlery, plates, a roll of paper towels and toilet paper.

- o $330.80 in purported "business expenditures" at Walmart. *See* SuperKlean_0000359, SuperKlean_0000360, SuperKlean_0000377, SuperKlean_0000378, SuperKlean_0000460, SuperKlean_0000466. The Government's subpoena to Walmart for the underlying receipts revealed that the expenses were for items such as Easter candy, plastic cups, produce, bread, Cheetos, a birthday card, tissue paper, and ankle weights.

- o $360.79 in purported "business expenditures at EZ Storage. *See* SuperKlean_0000359, SuperKlean_0000378, SuperKlean_0000388, SuperKlean_0000397, SuperKlean_0000409, SuperKlean_0000420,

16

SuperKlean_0000440.  Per SuperKlean's representations, these charges began on or about April 13, 2020, two months before the business was incorporated – when it had no clients or supplies or equipment.

o   $1,863.90 in purported "business expenditures" at Fleetcor Funding.  *See* SuperKlean_0000467, SuperKlean_0000482, SuperKlean_0000496, SuperKlean_0000498, SuperKlean_0000533, SuperKlean_0000535, SuperKlean_0000535.  The Government's subpoena to Fleetcor for the underlying receipts revealed that the expenses were for fuel – despite the fact that the Government's subpoena to SuperKlean revealed no clients for which commuting costs could legitimately be claimed as a business expense.

In April 2021, Adams applied for a position with the Seattle Police Department.  In the course of his background check, a Seattle Police Department detective noticed that Adams had obtained a PPP loan, but Adams had failed to disclose it in his written application or during an interview with the detective, as required.  On June 1, 2021, the detective sent Adams an email reminding him that he was required to disclose all employment and businesses and stating, "provide the name and type of business by which you were able to obtain a Federal PPP Loan and the purpose for the funds. What is the amount of your loan and the terms? This information was not listed in your PHI and you did not discuss it in your interview when we covered the financial issues of your background."  On June 2, 2021, in an email, Adams falsely responded, "My kids and I have a cleaning company called SuperKleanllc.  It's a janitorial cleaning business. The amount of the loan was $18,345 and the terms were 60 months at 1.0% interest.  *The purpose of the loan was to provide relief and assistance for my small business during the pandemic.*" (emphasis added).

III.    **Legal Discussion**

A. **Evidence of Adams' First PPP Loan and Repeated, Contemporaneous Submission of Inconsistent Information to the Government Regarding SuperKlean Is Admissible as Intrinsic and Inextricably Intertwined Evidence**

Adams' first loan application as well as inconsistent submissions in 2019 and 2020 of

17

federal and state tax filings, statements to a state law enforcement agency, creation of false evidence, and identification of false "business expenses" are all part of a single and intertwined story. These facts and this evidence cannot be excised from Adams' fraudulent submission of the second loan application, for which he was indicted and stands trial.

As the D.C. Circuit has explained, "Generally intrinsic evidence includes 'act[s] that [are] part of the charged offense' or 'some uncharged acts performed contemporaneously with the charged crime … if they facilitate the commission of the charged crime.'" *United States v. Bell*, 795 F.3d 88, 100 (D.C. Cir. 2015) (quoting *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000)); *see also United States v. McGill*, 815 F.3d 846, 879 (D.C. Cir. 2016) (approvingly quoting *Bowie,* 232 F.3d at 929); *United States v. Moore*, 651 F.3d 30, 63 (D.C. Cir. 2011) (approvingly quoting *Bowie,* 232 F.3d at 929); *United States v. Alexander*, 331 F.3d 116, 126 (D.C. Cir. 2003) ("[I]f evidence is offered as direct evidence of a fact in issue, not as circumstantial evidence requiring an inference regarding the character of the accused, it is properly considered intrinsic.") (internal quotations omitted); *United States v. Chin*, 83 F.3d 83, 88 (4th Cir. 1996) ("[A]cts are intrinsic when they are inextricably intertwined or [the] acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged.") (internal quotations omitted). Intrinsic evidence is part of the chain of events completing the story of the crime, *United States v. Fortenberry*, 971 F.2d 717, 721 (11th Cir. 1992), evidence that is "linked together in time and circumstances" with the crime charged, *United States v. Beechum*, 582 F.2d 898, 912 (5th Cir.

1976), and evidence that is part of a "continuing pattern of criminal activity," *United States v. Toney*, 161 F.3d 404, 413 (6th Cir. 1998).[5]

With respect to the 2019 and 2020 tax filings, these documents are inextricably intertwined with the fraudulent scheme, as the information contained within these documents, which were contemporaneously filed, is inconsistent with other information submitted in Adams EIDL and PPP loan applications. For instance, Adams' 2019 tax filing does not contain a Schedule C form or any information relevant to SuperKlean. This document is inconsistent with the information contained in the 2019 Schedule C that Adams caused to be submitted in connection with his first PPP loan. Similarly, the information contained within Adams' 2020 federal and state tax filing is inconsistent with the information he submitted in his EIDL loan application. As set forth in the Second Superseding Indictment, Adams falsely claimed in his EIDL loan application to have five employees and that his 11-year-old children were each 25% owners in the company. This information is inconsistent with the ownership percentages and businesses expenditures declared in Adams stated and federal returns for Tax Year 2020, where he claimed to be a 90% owner of the company and did not indicate that he had expenses consistent with five employees. This is further inconsistent with Adams' second loan application in which he claimed 100% ownership of SuperKlean. Put simply, two things cannot be true at once. This inconsistency makes a fact at issue, whether Adams' second PPP application was fraudulent, more probable. Fed. R. Evid. 401.

Similarly, the facts surrounding the first loan application, its receipt and use go to the knowing falsity of the certifications for his second loan application in January 2021. The

---

[5] Should the Court deem the aforementioned proffered evidence as intrinsic, it need not move to the Rule 404(b) inquiry. Evidence of other crimes or "uncharged conduct is not considered other crimes" for Rule 404(b) purposes "if it arose out of the same . . . series of transactions as the charged offense, . . . or if it is necessary to complete the story of the crime [on] trial." *United States v. Kennedy*, 32 F.3d 876, 885 (4th Cir. 1994) (internal quotation marks omitted).

certification regarding the use of the funds from the first PPP loan is intrinsic to Count Two as it is set forth in the indictment.  ECF 70 at 7.  "'Evidence that constitutes the very crime being prosecuted is not prior bad act evidence.'" *United States v. Wilkins*, 538 F. Supp. 3d 49, 70 (D.D.C. 2021) (quoting *United States v. Bowie*, 232 F.3d 923, 927 (D.C. Cir. 2000)).  The first loan application in this case "facilitated" the second.  *Bell*, 795 F.3d at 100.  The first loan application, its disbursement and use of funds by Adams is also intrinsic to the remaining charges because this was part of one ongoing scheme.  It provides the context and "setting" for the charged conduct here.  *United States v. Weinstock*, 153 F.3d 272, 277 (6th Cir. 1998) ("[T]he jury is entitled to know the 'setting' of a case. It cannot be expected to make its decision in a void-without knowledge of the time, place and circumstances of the acts which form the basis of the charge.").  It shows context that  is intrinsic to this matter.  *United States v. Daniels*, 117 F. Supp. 2d 1040, 1040 n.1 (D. Kan. 2000) (holding that defendant dentist's uncharged false statements regarding tonsillectomies was intrinsic to the charged fraud regarding the dentist's statements on a loss-of-taste complication).[6]

The government has the burden to prove the falsity of Adams' statements in the January 2021 application and to prove the falsehood set forth in the indictment, the government must discuss (a) that Adams applied for and received a first PPP loan and (2) that he did not use the funds for "eligible expenses."

With respect to his April 2021 application to the Seattle Police Department, Adams did not mention any information regarding SuperKlean or the loans he fraudulently obtained — because

---

[6] Also worth considering is the D.C. Circuit's acknowledgement in *United States v. Abou-Khatwa*, 40 F.4th 666, 682 (D.C. Cir. 2022), that "the government may 'rely on proof of scheme activity in an otherwise time-barred period'" to prove up charges of mail and wire fraud that were indicted.

he knew it was not a real, operating business and thus that he had nothing to disclose, or because he feared disclosing his fraudulently-obtained loans would expose criminal conduct. When confronted, Adams lied, claiming that he had only received $18,345, when he had actually received approximately $36,690, and falsely claiming that the "purpose of the loan was to provide relief and assistance for my small business during the pandemic." In truth and in fact, there was no business to provide relief or assistance to. Adams false representations were just an effort to conceal his fraudulent conduct. This false statement occurred approximately two months after he received his second PPP loan and three months before he applied for loan forgiveness for his first PPP loan. Adams' acts of concealment are intrinsic to the offense charged and "forms an integral and natural part of the account of crimes and is necessary to complete the story of the crimes for the jury." *United States v. Horner*, 2015 WL13357652, at *3 (N.D. Ga. Nov. 16, 2015).

Finally, after Adams became aware of the nature and scope of the Government's investigation in the fall of 2021, Adams created a fake invoice for SuperKlean and falsely identified business expenditures in response to a grand jury subpoena, all in an effort by Adams to conceal the fraudulent nature of the PPP loans he obtained and obstruct justice.

### B. The Evidence is Alternatively Admissible to Prove Motive, Opportunity, Intent, Preparation, Plan, Knowledge, Identity, Absence of Mistake, or Lack of Accident

Evidence of Adams' repeated, contemporaneous submission of fraudulent information to the Government regarding SuperKlean alternatively should properly be admitted under Rule 404(b), which governs the admission of other crimes, wrongs, and acts of a defendant. Under the rule, "other acts" evidence is admissible if offered for a permissible purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *See United States v. Pindell*, 336 F.3d 1049, 1056 (D.C. Cir. 2003), *cert. denied*, 540

U.S. 1200 (2004); *United States v. Miller*, 895 F.2d 1431, 1436 (D.C. Cir. 1990), *cert. denied*, 498 U.S. 825 (1990).

In determining whether "other act" evidence is admissible, the Court applies a two-part analysis. *First*, the Court examines whether the evidence is "probative of some material issue other than character." *United States v. Clarke*, 24 F.3d 257, 264 (D.C. Cir. 1994); *see also United States v. Douglas*, 482 F.3d 591, 596 (D.C. Cir. 2007) ("A proper analysis under Rule 404(b) begins with the question of relevance: is the other crime or act relevant and, if so, relevant to something other than the defendant's character or propensity [to commit crime]? If yes, the evidence is admissible unless excluded under other rules of evidence such as Rule 403."). The rule is one of inclusion, not exclusion, and evidence can properly be offered for any purpose other than solely to prove character. *See Douglas*, 482 F.3d at 596; *United States v. Lawson*, 410 F.3d 735, 740 (D.C. Cir. 2005); *United States v. Long*, 328 F.3d 655, 660-61 (D.C. Cir. 2003); *Bowie*, 232 F.3d at 929-30; *United States v. Crowder*, 141 F.3d 1202, 1206 (D.C. Cir. 1998) (en banc); *Miller*, 895 F.2d at 1436.

*Second*, if the Court deems evidence to have met the first part of this analysis, the Court should exclude it only if its probative value is "substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403; *United States v. Day*, 591 F.2d 861, 878 (D.C. Cir. 1978); *Huddleston v. United States*, 485 U.S. 681, 686 (1988); *see also United States v. Johnson*, 802 F.2d 1459, 1463-64 (D.C. Cir. 1986) ("the balance should generally be struck in favor of admission when the evidence indicates a close relationship to the event charged") (quoting *Day*, 591 F.2d at 878). The D.C. Circuit has emphasized that exclusion of otherwise relevant evidence is not appropriate if the evidence is merely prejudicial; the prejudice must be "unfair." *See United States v. Cassell*, 292 F.3d 788, 796 (D.C. Cir. 2002) ("Virtually all evidence is prejudicial or it isn't

material.  The prejudice must be unfair.") (internal quotation marks omitted).

Further, the Government is entitled to introduce evidence pursuant to Rule 404(b) in its case-in-chief to anticipate a defendant's likely defense of lack of intent or knowledge.  *See, e.g., United States v. Brown*, 597 F.3d 399, 404 (D.C. Cir. 2010) (extrinsic evidence of defendant's "knowledge, motive, and the absence of mistake or accident" was admissible under Rule 404(b) "to show his specific intent to defraud"); *see also United States v. Inserra*, 34 F.3d 83, 90 (2d Cir. 1994) ("[Rule 404(b) other crimes evidence] is admissible during the Government's case-in-chief if it is apparent that the defendant will dispute that issue."); *United States v. Harrod*, 856 F.2d 996, 1000 (7th Cir. 1988) ("[T]he Government may introduce evidence of other acts to establish intent in its case-in-chief."); *United States v. Estabrook*, 774 F.2d 284, 289 (8th Cir. 1985) ("[W]here it is made clear at the outset of the trial that the defendant's principal defense is a lack of knowledge or intent, and thus the issue is unarguably in dispute, the government may take the defendant at his word and introduce the evidence in its case-in-chief"); *United States v. Lewis*, 759 F.2d 1316, 1349 n. 14 (8th Cir. 1985) ("It was not necessary for the government to await defendant's denial of intent or knowledge before introducing [Rule 404(b) other crimes] evidence; instead the government may anticipate the defense and introduce it in its case-in-chief"); *United States v. Hooton*, 662 F.2d 628, 635 (9th Cir. 1981) (citation omitted) ("[E]ven in general intent crimes, the government can offer evidence of other acts as part of its case-in-chief when it is obvious that the defense will raise lack of intent as a defense.").

The Government's evidence regarding Adams' uncharged acts meets the first part of the analysis—whether the proposed evidence is probative of a material issue other than character—because it is probative of Adams' motive, intent, preparation, plan, knowledge, identity, and absence of mistake or accident, and is therefore admissible for multiple purposes pursuant to Rule

404(b). *See Crowder*, 141 F.3d at 1208 (Rule 404(b) evidence "will often have . . . multiple utility, showing at once intent, knowledge, motive, preparation and the like").

Here, pretrial briefing and during oral arguments during the leadup to the first trial the defense made clear the theory Adams believed that he and his "business" were entitled to loans under the EIDL and PPP programs, that he was unaware that the loan processor had submitted fraudulent PPP loan applications on his behalf for SuperKlean, and that Adams had not intended to cause the submission of fraudulent PPP loans. Accordingly, evidence of Adams' initial submission of an EIDL loan, as set forth in the Second Superseding Indictment, and tax filings regarding SuperKlean – specifically the contradictory information across all the government submissions – establish his personal knowledge and intent of the charged PPP fraud scheme. *See Huddleston*, 485 U.S. at 685 ("Extrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct."); *id.* ("the act in question was 'similar' to the one with which he was charged"). Adams' subsequent efforts to conceal the charged fraud scheme – through the creation of a fake invoice for SuperKlean, the false identification of business expenditures, and the false statement to the Seattle Police Department regarding SuperKlean – also underscore that Adams knew that his loan application was fraudulent and that he was not legally entitled to the PPP loan. *See, e.g.*, *United States v. Han*, 962 F.3d 568, 573 (D.C. Cir. 2020), *cert. denied*, 141 S. Ct. 1736 (2021) (evidence of defendant's other fraudulent misrepresentations were probative of intent); *United States v. Watson*, 894 F.2d 1345, 1349 (D.C. Cir. 1990) (finding that subsequent extrinsic act was admissible as relevant to defendant's intent and knowledge).

24

Similarly, all three categories of evidence –the submission of false information, the improper use of the first loan funds, and his ensuing steps to conceal – also are probative of that fact that the submission of the second fraudulent PPP loan application on Adams' behalf was not a mistake or accident. *See, e.g.*, *United States v. Willis*, 844 F.3d 155, 169–70 (3d Cir. 2016) (evidence that defendant had accepted other bribes was properly admitted as evidence of intent, knowledge, and absence of mistake). Adams' repeated submission of false information in the tax filings – consistent with the information in the PPP loan applications – demonstrates the preparation and planning Adams undertook to obtain government funds fraudulently. *See United States v. Murphy*, 768 F.2d 1518, 1535 (7th Cir. 1985) (evidence of other bad acts – that a judge had been accepting suspicious envelopes of cash – admissible to show a common plan and combat defense of mistake). Adams' contemporaneous submission of inconsistent tax filings regarding SuperKlean constituted a common plan, not mere accident or mistake, to obtain government funds. Finally, evidence that Adams falsely identified expenditures for SuperKlean also establish that he was motivated to obtain government funds for his personal – and not business – use. *See United States v. Bradshaw*, 690 F.2d 704, 708 (9th Cir. 1982) (Evidence of motive "is far from irrelevant. Motive is evidence of the commission of any crime," even where such motive evidence could show other criminal conduct.). This is all the more true with respect to admission of evidence on the first loan. As set forth above, this money was spent on personal expenses, including a trip to Las Vegas, providing Adams with a strong motive to submit a second fraudulent loan application. The fact that funds were depleted at the time Adams sought the second loan also shows strong motive to obtain more funds via a fraudulent loan application.

The Government is not planning to introduce evidence of Adams' uncharged acts for the purpose of establishing his character, but to establish his motive, intent, preparation, plan,

25

knowledge, identity, and absence of mistake or accident. *United States v. Loza*, 764 F. Supp. 2d 55, 57 (D.D.C. 2011) ("[A]ny purpose for which evidence is introduced is a proper purpose so long as the evidence is not offered solely to prove character or criminal propensity."). The next step in the analysis, then, is whether the evidence should nevertheless be excluded because its probative value is substantially outweighed by the danger of unfair prejudice. Here, the probative value of evidence of Adams' submission of fraudulent information to the Government regarding SuperKlean in various forms – contemporaneous with the PPP fraud scheme in the instant case – far outweighs the danger of unfair prejudice. It is not unfairly prejudicial for the jury to learn that Adams made similarly false misrepresentations regarding SuperKlean in his initial and unsuccessful EIDL application and in tax filings, or that he attempted to conceal his fraudulent procurement of PPP loans by creating a fake SuperKlean invoice and falsely identifying business expenditures. It similarly is not prejudicial for the jury to hear that Adams submitted a first loan application and misused those funds as it goes to his knowledge, planning, preparation, and lack of mistake at the time he made false statements in the January 2021 loan application. Specifically, his first PPP loan application goes directly to his understanding of the PPP loan process. And his second PPP loan application is directly related to his experience with his initial application. For example, he initiated contact G.B., the same loan preparer, referenced that this would be his second application, and certified in that application that he received and used the original PPP funds for eligible expenses. In addition, the probative value of this evidence is significant: it goes directly to the central issue in the case, Adams's mental state and intent when he submitted and caused to be submitted the false and fraudulent claims about SuperKlean. Moreover, the Rule 404(b) evidence will be presented in limited form through testimony and documents as described above, and will not prolong the Government's presentation. In addition, in order to avoid any potential

26

prejudice, the Court can provide the jury with a limiting instruction to consider the evidence only for its intended, proper purposes. *See U.S. v. Brown*, 597 F.3d 399, 400 (D.C. Cir. 2010) ("The district court's limiting instructions guarded against the jury's reliance on impermissible inferences that might have been drawn from the Rule 404(b) evidence.").

### C. The Fact that Adams Was Acquitted of Count One is of No Moment in this Analysis

Courts have consistently acknowledged that previously acquitted conduct may properly be introduced pursuant to Rule 404(b). This Circuit has acknowledged that previously acquitted conduct may be introduced in a subsequent case. *United States v. Long*, 328 F.3d 655, 661 (D.C. Cir. 2003) ("The other activity need not have resulted in a charge or conviction; indeed, the defendant may even have been acquitted of the conduct, or the conduct may have been entirely lawful.") (*abrogated on other grounds*, *United States v. Mohammed*, 89 F.4th 158 (D.C. Cir. 2023)); *see also United States v. Hite*, 916 F. Supp. 2d 110, 123 n.8 (D.D.C. 2013). "The Supreme Court has recognized that evidence on acquitted conduct may be admissible under Rule 404(b) because the Rule has a lower standard of proof than that required for a conviction." *United States v. Rosario*, 931 F. Supp. 2d 75, 77 n.2 (D.D.C. 2013) (citing *Dowling v. United States*, 493 U.S. 342, 349, 110 S. Ct. 668, 672, 107 L. Ed. 2d 708 (1990) ("Our decision is consistent with other cases where we have held that an acquittal in a criminal case does not preclude the Government from relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof.")). Here, there is a preponderance of evidence, in the form of receipts, text messages, and emails, that Adams applied for the first PPP loan and used the funds for ineligible expenses. While the government does not intend to relitigate the merits of the acquitted conduct, the government should be permitted to admit information from the first PPP loan to establish the falsity of the information in the second PPP loan application and to establish the Adams knowledge of

the PPP loan process.[7]

## IV.    Conclusion

For the foregoing reasons, the Government respectfully requests permission to introduce the above-described evidence as intrinsic evidence or other crimes evidence pursuant to Fed. R. Evid. 404(b).

Respectfully Submitted,

Jeanine Ferris Pirro
United States Attorney

By:    */s/ Caelainn Carney*
Caelainn Carney (N.Y. Bar No. 5751672)
Sarah C. Santiago (GA Bar No. 724304)
Assistant United States Attorneys
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20530
Email: caelainn.carney@usdoj.gov
Telephone: 202-714-6433

---

[7] The Eighth Circuit, in *United States v. Vega*, 676 F.3d 708, 719 (8th Cir. 2012), considered the admission of acquitted conduct in the retrial of a drug trafficking case. The District Court allowed the facts of a prior acquitted drug transaction into evidence where the defendant was being tried for trafficking methamphetamine in connection with the execution of a search warrant ten days after the first incident. Notably, based on the recitation of facts by the Eighth Circuit, the government was not limited in its account of the first transaction. *Id*. at 713. In affirming the District Court, the Eighth Circuit acknowledged that the offenses were close in time and of the same type, particularly with respect to the fact that the defendant used the same distinctive drug packaging across the two incidents. *Id*. at 719. And the court acknowledged that any prejudice to the defendant was properly managed via a limiting instruction regarding the evidence. *Id*. at 720. Similarly, here, Adams used the same *modus operandi*, that is the same loan preparer, information, and application process for both his first and second PPP loan applications.